1997 ME 131

Anne Marie QUIN

v.

Robert M. QUINN.

Supreme Judicial Court of Maine.

Submitted on Briefs Feb. 7, 1997.
Decided June 11, 1997.

George Z. Singal, F. Todd Lowell, Gross, Minsky, Mogul & Singal, Bangor, for plaintiff.

Phillip D. Buckley, Brent A. Singer, Rudman & Winchell, Bangor, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, and DANA, JJ.

GLASSMAN, Justice.

[¶ 1] Robert M. Quinn appeals from the judgment entered in the Superior Court (Penobscot County, *Kravchuk, J.*) affirming the judgment of the District Court (Bangor, *Mead, J.*), dated March 24, 1995, following our decision in *Quin v. Quinn*, 641 A.2d 180 (Me.1994), in which we vacated the judgment entered in the Superior Court (Penobscot County, *Kravchuk, J.*) affirming the judgment of the District Court (Bangor, *Mead, J.*), dated February 10, 1992, granting a divorce to Robert M. Quinn and Anne Marie

Quinn,[1] and instructed the Superior Court to remand the matter to the District Court for further proceedings consistent with our opinion.

■ [¶ 2] Robert contends that on the remand of this case the District Court erred as a matter of law by reconsidering issues of the division of marital property and alimony and by the extent it punished him for his economic misconduct during the course of the marriage. Our review of the record discloses no error of law or abuse of the trial court's discretion, and accordingly, we affirm the judgment.

■ [¶ 3] When, as here, the Superior Court acts as an intermediate appellate court, we review directly the record before the District Court to determine if there was any error of law that affected the validity of the judgment. *Page v. Page,* 671 A.2d 956, 957 (Me.1996). "Issues arising out of a divorce action, such as property division [and] alimony ... are within the court's sound discretion ... and the judgment of the [trial] court on such matters is entitled to substantial deference." *Knight v. Knight,* 680 A.2d 1035, 1037 (Me.1996) (citing *Shirley v. Shirley,* 482 A.2d 845, 847–48 (Me.1984)).

[¶ 4] Robert first contends the District Court erred as a matter of law by its reconsideration of the division of marital property and alimony. He argues that absent a substantial change in the financial condition of the parties, the court's authority on remand was limited to an adjustment for the economic impact of his transfer of the Sugarloaf condominium. We disagree. In *Quin v. Quinn,* 641 A.2d at 181–82, we determined that the trial court had committed clear error by finding that there was no economic misconduct by Robert's unilateral transfer of the Sugarloaf condominium, purchased with marital funds, to the parties' adult children for a nominal consideration.

■ [¶ 5] Recognizing the impact of a single economic issue on all others, we have made clear in our opinions vacating divorce judgments on an economic issue that the trial court is in no way to be impeded by its previous decision. *See, e.g., Grishman v. Grishman,* 407 A.2d 9, 12 (Me.1979). In arriving at a new judgment in the case, the trial court may properly consider a wide range of pertinent factors with the discretion to open the record to allow the parties to introduce new evidence relating to the economic issues properly before the court. *Sweeney v. Sweeney,* 534 A.2d 1290, 1292 (Me.1987). These principles were reaffirmed in *Quin v. Quinn,* 641 A.2d at 182, wherein we stated, "On remand, the District Court should take into account the defendant's economic misconduct and reconsider the alimony issue, and to the extent necessary, all of the economic issues." The application of these well-established principles to the procedure followed by the District Court in the present case refutes Robert's contention that the District Court erred as a matter of law by not confining its consideration to the economic impact of Robert's economic misconduct in arriving at the present judgment.

■ [¶ 6] Robert next contends the trial court erred as a matter of law by punishing him for his economic misconduct. He argues that this erroneous punishment is manifested by the clearly erroneous findings on which the court based its award of the marital home to Anne Marie and the amount of alimony awarded to her. We disagree. "The disposition of marital property is a matter committed to the sound discretion of the trial court and reviewable only for an abuse of discretion." *Arey v. Arey,* 651 A.2d 351, 353 (Me.1994). *See* 19 M.R.S.A. § 722–A (1981 & Supp.1996) (governing disposition of property, *inter alia,* in a proceeding for a divorce). Absent a violation of some positive rule of law we defer to the discretion of the trial court and will overturn its decision as to the disposition of marital property and the amount of an alimony award "only if it results in a plain and unmistakable injustice, so apparent that it is instantly visible without argument." *Arey v. Arey,* 651 A.2d at 353–54 (citations omitted). *See also* 19 M.R.S.A. § 721 (Supp.1996) (setting forth factors to

---

1. Pursuant to the judgment, dated February 10, 1992, the plaintiff resumed the use of her prior name.

consider when determining an award of alimony that includes "[e]conomic misconduct by either party resulting in the diminution of marital property or income"); *Strater v. Strater*, 159 Me. 508, 518, 196 A.2d 94 (1963) ("There is no universal standard which [the court] may apply in determining the amount of alimony in any given case."); *Shirley v. Shirley*, 482 A.2d at 847–48 (incidents of divorce such as property division and alimony addressed to trial court's sound discretion, and "it is particularly inappropriate ... to undertake an independent evaluation based on a cold record.").

[¶ 7] The record reflects that following our decision in *Quin v. Quinn*, the trial court, after a conference with the parties, issued a scheduling order that reopened the record to allow the parties to engage in a course of discovery to enable the court to evaluate the current economic status of each party. Both parties engaged in the discovery process without objection. After a two-day hearing in January 1995, at which each party appeared and testified regarding that party's finances, followed by written argument by the parties, the court issued its judgment on March 24, 1995, followed by additional findings of fact and conclusions of law on June 14, 1995. In arriving at its decision, the court stated, "After considering the economic misconduct of the Defendant, the economic benefit of the misconduct to the Defendant, and the *current economic circumstances of the parties....*" (Emphasis added).

[¶ 8] Although Robert focuses entirely on the value of the Sugarloaf condominium to support his contention that the amount of the alimony award to Anne Marie can only be attributable to punishment for his economic misconduct, the findings of the court disclose that it considered a wide range of pertinent factors in reaching its decision, including the following:[2] Anne Marie's annual income is $16,000 and Robert's is $35,000; the value of Robert's nonmarital property substantially exceeds that of Anne Marie's; Robert has voluntarily reduced his income stream and productivity in anticipation of the divorce; he has permitted the Quinn Agency to occupy the marital real property at 272 Hammond Street, Bangor,[3] rent free and has chosen to eliminate a source of marital income by failing to rent other portions of the building. Since the commencement of the divorce action, Robert has failed to account to Anne Marie for any rental income relating to that property. During the period Robert's salary has gone down, production at the Quinn Agency has increased, and although during this period the sales people at the Agency received commissions, Robert elected not to do so. Robert freely supplements his income by his personal use of the Quinn Agency assets for expenses, including living costs, travel, entertainment, vacations and gifts. He admits to taking income as loans from the corporation rather than commissions or increased salary. He continues to use the Sugarloaf condominium as a vacation residence for which he pays no rent and has caused the Quinn Agency to pay an average annual amount of $3000 for all related costs for his use, including his personal ski lift tickets.

[¶ 9] Our review of the record discloses that the findings of the trial court are supported by the evidence and are not clearly erroneous. Nor did the court's disposition of the marital property and award of alimony to Anne Marie violate "some positive rule of law or [reach] a result which is [so] plainly and unmistakably an injustice that is so apparent as to be instantly visible without argument." *Arey v. Arey*, 651 A.2d at 354 (citation and quotation omitted).

The entry is:

Judgment affirmed.

---

2. Based on the disclosure in the record that in February 1992 Anne Marie was 56 years of age and Robert was 60 years of age, at the time of the judgment at issue here the parties were 59 and 63, respectively. The record further discloses that the parties were married on June 28, 1958, have five adult children, the issue of the marriage, and contributed equally to the acquisition of their marital property.

3. This property was set aside to Robert, together with the Quinn Agency. Reading Consultancy, owned and operated by Anne Marie and set aside to her, rents space at approximately $3,000 a year. There is no evidence in the record that the marital home, set aside to Anne Marie, is income producing property.

ᗞANA, Justice, dissenting.

[¶ 10] I respectfully dissent. Because the court's amended alimony award so severely punishes Robert's economic misconduct, *Quin v. Quinn,* 641 A.2d 180, 181 (Me.1994) (footnote omitted), this Court should label it a plain and unmistakable injustice.

[¶ 11] In its original divorce judgment the court, after equally dividing the marital property, awarded alimony to Anne Marie as follows: (1) health and life insurance for her benefit for five years; (2) $110 per week for five years (ending February 10, 1997); and (3) mortgage payments of $1,120 per month on a home located on West Broadway in Bangor for 18 months or until she sold it, whichever occurred first, after which the parties were to have divided the equity equally (then approximately $70,000 each).[4] The court's amended judgment on remand requires Robert to (1) increase periodic alimony payments (in present value terms) by what amounts to approximately $60,000, (2) transfer his half of the equity of the West Broadway property, worth approximately $75,000, and (3) retire a mortgage debt of approximately $80,000 (unless the property is sold first). In sum, the court's amended judgment awards Anne Marie an additional $215,000, despite the fact that Robert's economic misconduct—his transfer of the Sugarloaf condominium to their children—depleted Anne Marie's share of the marital estate by only $73,500 (a figure that accounts for the additional expenses to the estate in transfer taxes).

[¶ 12] While the court was not required to limit the award on remand to a dollar-for-dollar set off of the value of the economic misconduct, *see,e.g., Skelton v. Skelton,* 490 A.2d 1204, 1207 (Me.1985); *Bryant v. Bryant,* 411 A.2d 391, 394–95 (Me.1980), it awarded Anne Marie nearly three times the value of the impact of Robert's economic misconduct on her.[5] Anne Marie before the Superior Court and again here contends that the court's alimony award is justified in part by the parties' changed financial circumstances. However, neither the evidence introduced in 1995 nor the court's findings support the conclusion that the increase in the alimony award is attributable to other than Robert's economic misconduct.

[¶ 13] Even when reviewing the present judgment as if it were the only judgment, this conclusion holds. After the 1995 hearing the court reaffirmed its 1992 finding that during this 34–year marriage "the contributions of the parties to the marital estate [were] approximately equal and thus [the court] attempts to distribute the property on that basis." According to the court's findings, Robert has an income of about $35,000.[6] Being 66 years of age, he had hoped to retire by now, but pursuant to the judgment must pay alimony of $23,640 per year ($1,970 per month), consisting of monthly mortgage payments on the West Broadway residence of $1,120 until the debt is retired or the property sold and monthly cash payments of $850 for ten years or until Anne Marie's death or remarriage. Thus, Robert has approximately $11,360 left of his annual income with which

---

4. *In its further findings and conclusions, the court explained:*

> The award of alimony in the form of mortgage payments terminates upon the passage of 18 months or when the property is sold—whichever occurs first.... The purpose of this award is to allow [Anne Marie] to reside in the property while insulating her from the mortgage obligation. As this obligation concludes upon the sale of the property, the alimony likewise terminates. The court deems 18 months to be an appropriate maximum period to allow [Anne Marie] to make housing arrangements pending the sale of the property.

5. Even if Anne Marie were to sell the West Broadway property, which she is under no obligation to do, and retire the mortgage note with

the sale proceeds, the amended judgment would result in increased alimony of approximately $135,000, nearly *twice* the amount of the adverse economic impact of Robert's economic misconduct.

6. The court found that Robert voluntarily reduced his draw from the Quinn Agency's gross receipts from $800 to $600/week. However, it also found that he charges many of his living and recreational expenses to the Agency and attempts to account for them at the end of the year. When the court found that "$35,000 appropriately represents [Robert's] annual income," it was including these benefits taken through the Agency. Finally, Robert receives no additional personal income from rental of the Hammond Street apartment; since 1995 it has served as the Agency rental division's office space.

to support himself and pay Anne Marie's lawyer the $20,000 the court ordered him to pay. Robert retains his business and the Hammond Street building, which is worth $92,000, slightly more than the debt he owes on the West Broadway property ($79,400).[7] The court found that Anne Marie has an annual income of $16,000[8] and a recent inheritance of approximately $93,000, and retains her business, the Reading Consultancy, with branch offices in Bangor, Bar Harbor and Falmouth. The judgment awards her the West Broadway residence in Bangor worth $231,250, and a Bar Harbor condominium worth $90,000, both without any mortgage obligation (unless she sells the West Broadway property). Thus, the judgment divides the real estate so that Anne Marie retains $320,000 worth of the property and Robert keeps $12,600 (Hammond Street less the debt on West Broadway). Compounding this unfairness, Robert must continue to work during his normal retirement years to pay two thirds of his current income in periodic alimony to his already comfortably situated former wife. This seems plainly and unmistakably an injustice, and I would therefore vacate the judgment.

---

7. The record reveals that Robert is one of six beneficiaries of one of four family trusts established by his father that jointly own real estate valued at approximately $1,000,000. Although simple division places his beneficial interest at approximately $42,000, in fact, Robert testified that only his father's grandchildren have ever received distributions from the trusts. The court made no findings as to this asset.

8. The court qualified this finding, however, explaining that it was based on limited hard data about the amounts of time billed by Anne Marie's employees and the income they generated for her, in large part because she does not keep regular business records (e.g., bills to students, records of deposits, documentation of income). The court also noted that a 1994 car loan application submitted to the Bangor Savings Bank lists Anne Marie's annual income as $50,000/year. She denies having stated that figure to the loan officer.